MARGARET M. LAMBACHER,　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　Plaintiff　　　　　:　　CIVIL NO. 3:11-CV-02183
　　　　　　　　　　　　　　　　:
　　　vs.　　　　　　　　　　:　　(Judge Conaboy)
　　　　　　　　　　　　　　　　:
MICHAEL J. ASTRUE,　　　　　:
COMMISSIONER OF SOCIAL　　　:
SECURITY,　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　Defendant　　　　　:

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Margaret M. Lambacher's claim for social security disability insurance benefits and supplemental security income benefits.

Lambacher protectively filed[1] on May 29, 2008, an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 34, 76, 78, 108, 116-117 and 125.[2]  On December 29, 2008, the Bureau of Disability Determination[3] denied Lambacher's applications. Tr. 81-86 and 92-

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on January 23, 2012.

3.  The Bureau of Disability Determination is an agency of the
(continued...)

97. On January 9, 2009, Lambacher requested a hearing before an administrative law judge. Tr. 103-104. After 10 months had passed, a hearing was held on November 9, 2009. Tr. Tr. 45-73. On January 20, 2010, the administrative law judge issued a decision denying Lambacher's applications. Tr. 34-44. On February 5, 2010, Lambacher requested that the Appeals Council review the administrative law judge's decision. Tr. Tr. 26-30. After 19 months had passed, the Appeals Council on September 23, 2011, concluded that there was no basis upon which to grant Lambacher's request for review.[4] Tr. 1-6. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Lambacher then filed a complaint in this court on November 23, 2011. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on July 3, 2012, when Lambacher filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.

---

3. (...continued)
state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 81 and 92.

4. Lambacher's request for review was originally denied on June 16, 2011, but that denial was vacated to allow Lambacher to file a supporting brief. Tr. 7-16.

5. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Lambacher met the insured status requirements of the Social Security Act through December 31, 2007. Tr. 34, 36, 119 and 126. In order to establish entitlement to disability insurance benefits Lambacher was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Lambacher, who was born in the United States on May 10, 1968,[6] graduated from high school in 1988. Tr. 50, 76, 108, 116, 125 and 134. Lambacher can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 51, 128 and 147. 151 and 339. During her elementary and secondary

_____

6. At the time of the administrative hearing and the administrative law judge's decision, Lambacher was 41 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

3

schooling Lambacher attended regular education classes. Tr. 134.
After graduating from high school, Lambacher did not obtain any
other training.  Id.

Lambacher has past relevant employment[7] as (1) a
warehouse worker which was described as unskilled, medium work by
a vocational expert and (2) a personal care assistant which was
described as semi-skilled, heavy work.[8]  Lambacher indicated that

---

7.  Past relevant employment in the present case means work
performed by Lambacher during the 15 years prior to the date her
claim for disability was adjudicated by the Commissioner.  20
C.F.R. §§ 404.1560 and 404.1565.

8.  The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work*. Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine

(continued...)

she worked as a warehouse worker from February, 1995, to February, 1999, and as a personal care assistant from 1990 to April 5, 2007. Tr. 136.

Records of the Social Security Administration reveal that Lambacher had reported earnings in the years 1984, 1986, 1987, 1989 through 1991, 1995 through 1999, and 2004 through 2007. Tr. 121. Lambacher's highest annual earnings were in 2006 ($13,246.90) and her lowest in 1984 ($179.50). Id. Lambacher's total earnings during those fifteen years were $53,015.30 Id. Lambacher's work and earnings amounted to substantial gainful activity only in the

---

8. (...continued)
    dexterity or inability to sit for long periods of time.

    (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

    (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

years 1998 ($6290.25), 2005 ($12,470.33) and 2006.[9] Lambacher has no reported earnings after 2007.[10] Id.

Lambacher claims that she became disabled on April 5, 2007, because of "asthma, scoliosis, high blood pressure, anxiety, depression, cervical radiculopathy, degenerative disc disease, [and] chronic neck, shoulder and arm pain." Tr. 129. She testified that she cannot work because her medications make her drowsy and tired, she drops things with her right hand, and she has constant pain in her back, neck and shoulders which varies in intensity. Tr. 52-53. The record reveals that Lambacher had "neck spine fusion" in June, 2001, but still was able to engage in heavy work as a personal care assistant earning over $12,000 in 2005 and 2006. 130, 171 and 390.

Lambacher reported performing a variety of daily activities and household chores. She occasionally laundered clothing and prepared simple meals. Tr. 146. Lambacher regularly watched television, and had cookouts with friends twice a month.

---

9. Pursuant Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity. The official website of the Social Security Administration reveals that in 1998 that amount was $500 per month ($6000 per year); in 2004 $810 per month ($9720 per year); in 2005 $830 per month ($9960 per year); in 2006 $860 per month ($10,320 per year); and in 2007 $900 per month ($10,800 per year). Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed March 12, 2013).

10. In 2007 Lambacher's reported earnings were $3228.13. Tr. 121.

Tr. 148.  Plaintiff testified that she was able to take care of her personal needs, shower and dress herself and that she belonged to a social club at her residence and helped run bingo games, a New Year's Eve Party, and other similar events. Tr. 57 and 59.  In a document entitled "Function Report - Adult" when given an opportunity to check "items that [her] illnesses, injuries, or conditions affect" did not check squatting, talking, hearing, seeing, memory, completing tasks, understanding, following instructions, using hands and getting along with others. Tr. 149. Lambacher also testified that she has no problem with (1) her memory, (2) getting along with others and (3) crowded places. Tr. 56-57.  With respect to her alleged anxiety and depression she testified that she never sought counseling and is only receiving medications from her primary care physician. Tr. 56.  As for Lambacher's asthma the record reveals that she has a long history of smoking and that she continues to smoke.  Tr. 57, 171, 206 and 290.

     For the reasons set forth below we will affirm the decision of the Commissioner denying Lambacher's applications for disability insurance benefits and supplemental security income benefits.

**STANDARD OF REVIEW**

     When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.

See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d
Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181
F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d
857, 858 (3d Cir. 1995). However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir.
1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); <u>Cotter
v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71
F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176
(4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

     Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565
(1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197,

229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is

---

11.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation

(continued...)

10

severe or a combination of impairments that is severe,[12] (3) has

an impairment or combination of impairments that meets or equals

the requirements of a listed impairment,[13] (4) has the residual

---

11.  (...continued)
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

12.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520© and 416.920©. If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545©.

13.   If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
(continued...)

functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id.  As part of step four the administrative law judge
must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment must
include a discussion of the individual's abilities.  Id; 20 C.F.R.
§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

---

13.  (...continued)
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

14.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Lambacher's medical records. We will commence with two sets of emergency department records from Geisinger South Wilkes-Barre dated July 11 and November 29, 2006, which predate Lambacher's alleged disability onset date of April 5, 2007.

On July 11th, Lambacher visited the emergency department complaining of abdominal pain, diarrhea and vomiting blood. Tr. 206 and 208. Lambacher was ambulatory at the time of her arrival and her blood pressure was 100/66. Tr. 206. She complained of a pain level of 9 on a scale of 1 to 10. Id. She denied chest pain. Id. July 11th was a Tuesday and Lambacher indicated that the pain started the previous Thursday. Id. Several diagnostic tests were performed, including a complete blood count and a complete metabolic panel. Tr. 204. The results of those blood tests were within normal limits. Id. When the attending medical provider reviewed Lambacher's systems, Lambacher denied back and musculoskeletal problems, bone or joint pain, weakness, headaches, seizures, dizziness, depression, anxiety, shortness of breath, cough, and wheezing.[15] Tr. 205. The results of the physical

---

15. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and
(continued...)

examination were essentially normal, other than tenderness in the abdomen. Id. Her gait was normal and with respect to her musculoskeletal system she had normal range of motion and normal strength and tone. Id. Neurologically and psychological she was noted to be completely normal. Id. Lambacher was diagnosed as suffering from gastritis and her condition improved and she was discharged from the hospital after being administered the drug Reglan[16] with instructions to follow-up with her primary care physician. Tr. 204.

On November 29th Lambacher visited the emergency department complaining of bilateral lower leg swelling. Tr. 188. Lambacher was ambulatory at the time of her arrival and her blood pressure was 123/79. Id. When the attending medical provider reviewed Lambacher's systems, Lambacher denied back and musculoskeletal problems, bone or joint pain, weakness, headaches, seizures, dizziness, depression, anxiety, shortness of breath, cough, and wheezing. Tr. 187. The results of the physical examination were essentially normal, other than bilateral lower

15.  (...continued)
disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed March 13, 2013).

16.  "Reglan is used short-term to treat heartburn caused by gastroesophageal reflux[.]" Reglan, Drugs.com, http://www.drugs.com/reglan.html (Last accessed March 12, 2013.)

extremity edema.  Id.  Her gait was normal and with respect to her musculoskeletal system she had normal range of motion and normal strength and tone. Id.  Neurologically and psychological she was noted to be completely normal. Id.  Lambacher denied abdominal pain, diarrhea or vomiting. Tr. 189.  Range of motion in the bilateral lower extremities was normal and Lambacher had no numbness. Id.  Lambacher denied any pain. Id.  Several diagnostic tests were performed, including a complete blood count and a complete metabolic panel. Tr. 186.  The diagnostic impression was bilateral leg edema of unknown etiology. Id.  Lambacher was discharged from the hospital with instructions to follow-up with her primary care physician. Tr. 203.

    After the alleged onset date of April 5, 2007, Lambacher on June 17, 2007, visited the emergency department at Geisinger South Wilkes-Barre complaining of injuries received from an assault by her brother. Tr. 246.  Lambacher was punched in the left eye and kicked in the right ribs and shoulder. Tr. 249.  The results of a physical examination were essentially normal other than she had "minimal tenderness [Left] infraorbital area"[17] and her right shoulder would not move because of pain. Tr. 246  Her gait was normal and with respect to her musculoskeletal system,

_____

17.  The "infraorbital area" refers to the area below or beneath the eye socket.

other than her right shoulder, she had normal range of motion and normal strength and tone. Id. Neurologically and psychological she was noted to be completely normal. Id. An x-ray of the right shoulder revealed "no evidence of fracture, dislocation or bony destruction." Tr. 252. Lambacher was discharged from the hospital ambulatory after receiving pain medications and a sling. Tr. 250 and 258.

On June 29, 2007, Lambacher visited the emergency department at Geisinger South Wilkes-Barre complaining of an altered mental state with extremity tremors and edema. Tr. 227. Lambacher was taken to the hospital by ambulance. Id. The results of a physical examination were essentially normal. Tr. 224. Her gait was normal and with respect to her musculoskeletal system she had normal range of motion and normal strength and tone. Id. Neurologically she was noted to be completely normal. Id. Blood tests revealed the presence of opiates and cannabinoids (marijuana). Tr. 232. A CT scan of Lambacher's head was normal. Tr. 237. The diagnostic impression was "medication [reaction] – side effect to narcotics and muscle relaxant." Tr. 223. Lambacher was discharged from the hospital with instructions to stop taking the narcotic Vicodin and the muscle relaxant Soma. Tr. 239.

Following complaints of numbness, tingling and fatigue, Lambacher on November 7, 2007, had an MRI of the cervical spine

performed at Imaging Services of Wyoming Valley Health Care System. Tr. 389-390.  The MRI revealed the pre-existing fusion surgery at C5-C6, some narrowing of the spinal canal with no cord compromise, and only minimal central disc bulges with no evidence of neuroforaminal stenosis at any level. Id.

The record contains treatment notes from Lambacher's treating physician, Mark Gonsky, D.O., beginning in December, 2007. Tr. 279.  The treatment notes are dated December 20, 2007, January 21, February 18 and 23, March 17, April 21, May 9 and 22, June 23 and 30, August 14 and 25, September 4 and 29, and November 10 2008, and January 19, February 16, March 16, May 28, July 29 and September 24, 2009. Tr. 262-264, 266, 273, 275-279, 331-332, 334-335 and 337-354.  Dr. Gonsky's treatment notes show that the results of physical examinations routinely and consistently were essentially normal other than with respect to sporadic appointments where she had cervical muscle spasm, tenderness, and right shoulder reduced range of motion and not all of these conditions were  observed at each of the appointments.[18] Id.  Out of a total of 21 appointments there were 11 appointments where one or more of these conditions were observed leaving 10 appointments where Dr. Gonsky reported completely normal (within normal limits

_____

18.  Right shoulder reduced range of motion was only observed and reported on one occasion. Tr. 279.  Lambacher is right-handed. Tr. 149.

(WNL)) physical examination findings Id. Dr. Gonsky on February 16, 2009, completed a document on behalf of Lambacher entitled "Pennsylvania Department of Public Welfare Employability Re-Assessment Form." Tr. 320-321. In that document Dr. Gonsky in a conclusory fashion (without specifying Lambacher's ability to sit, stand, walk, lift/carry and perform postural activities) that Lambacher was permanently disabled. Id.

During this time frame, objective tests also revealed only mild conditions and symptoms. An electromyogram performed on April 30, 2008, was completely normal and revealed "no electrophysiological evidence of compression median or ulnar nerve neuropathy, myopathy, or cervical radiculopathy." Tr. 179. A cervical spine x-ray performed on the same day revealed "postoperative changes at the level of C5-C6" but no significant change in the overall appearance of the cervical spine as compared to [the] study of 2/4/2002." Tr. 272.

The record reveals three other occasions -- February 20, August 23 and September 2, 2008 -- where Lambacher visited the emergency department at Geisinger South Wilkes-Barre. Tr. 170-178, 285-291 and 294.

On February 20, 2008, Lambacher complained of moderate chest pain which radiated to the left arm but she denied any other complaints. Tr. 170. It was noted that the medical provider

reviewed ten systems with Lambacher with no reported complaints. Tr. 171.  Other than an elevated blood pressure at 145/90, the results of a physical examination were normal, including she had a supple, nontender neck; her back was symmetrical on inspection and there was no deformity and no midline tenderness; her upper extremities were normal with no edema, discoloration and she had good strength in both arms; her lower extremities were normal with no edema or discoloration; and she had a normal sensorium, cranial nerves II-XII were grossly intact, she had normal speech, and no weakness in the arms or legs. Tr. 172-173.  An EKG performed at this appointment was normal. Tr. 174.  A chest x-ray revealed "[n]o acute intrathoracic process." Tr. 178. The diagnostic impression was "[c]hest pain of uncertain etiology." Tr. 174. Lambacher was discharged from the hospital on the same day. Id.

On August 23, 2008, Lambacher complained of left elbow pain and swelling but she denied any other complaints.  Tr. 285-289.  The results of a physical examination were completely normal, other than tenderness and swelling on the posterior aspect of the left elbow. Tr. 285-286.  An x-ray of the left elbow revealed "no findings of an acute fracture or elbow joint effusion" but "a small calcification seen adjacent to the

olecranon[19] which has increased in size since the previous series from 6/30/05." Tr. 289. The diagnostic impression was "cellulitis left elbow." Tr. 286. Lambacher was discharged from the hospital on the same day. Tr. 287.

On September 2, 2008, Lambacher complained of low back pain and denied any similar pain in the past; she complained of some left arm numbness and pain and claimed she had chronic neck pain. Tr. 290. She also complained of a headache. Id. She denied any history of high blood pressure and diabetes. Id. The report of this appointment specifically notes that Lambacher "was discharged from previous family physician's practice after breaking a contract with chemical substances." Id. The physical examination portion of the report states in toto as follows: "Afrebrile. Blood pressure 131/82, pulse 74, respiratory rate 18. She is alert and oriented in no acute distress. Skin is warm and dry. Lungs are clear with good breath sounds bilaterally. Heart regular rhythm without extra sounds. Neck: There is mild posterior tenderness. Back: Mild diffuse bilateral lumbar paravertebral muscle tenderness with no obvious spasm. No costovertebral angle tenderness. She has slightly decreased strength in her right upper

---

19. The olecranon is the large bony process (eminence) on the upper end of the ulna that projects behind the elbow joint and forms the point of the elbow. See Dorland's Illustrated Medical Dictionary, 1317 (32nd Ed. 2012).

extremity as compared to the left. Lower extremity strength is intact and symmetrical. She has good deep tendon reflexes in the upper and lower extremities which are symmetrical." Id.  The diagnostic impression was "[b]ack pain of probable muscular etiology in patient with chronic neck pain." Id.  Lambacher was prescribed pain medications and discharged from the hospital. Id.

On October 23, 2008, Maria Mera, D.O., a state agency physician performed a one-time examination of Lambacher and concluded that Lambacher could not engage in full-time sedentary work. Tr. 295-298, 301-302 and 316-318.  The primary item preventing Lambacher from doing so was Lambacher's inability to lift/carry more than 10 pounds and sit for more than 2-4 hours during and 8-hour workday. Tr. 295.  Dr. Mera also stated that Lambacher could never engage in bending, kneeling, stooping, crouching, balancing and climbing. Tr. 296.  Upon physical examination, Lambacher had 4+/5 strength in her right upper extremity, 4/5 strength in her right grip, and normal strength in her left upper extremity and both lower extremities. Tr. 317. Lambacher had somewhat decreased range of motion in her right shoulder and lumbar spine, and normal range of motion in her left shoulder and cervical spine.  Id.

On December 17, 2008, a state agency physician, Louis Tedesco, M.D., examined Lambacher's medical records and concluded

that Lambacher could engage in a limited range of light work. Tr.
309-315.  Dr. Tedesco found that Lambacher could occasionally
lift/carry 20 pounds and frequently lift/carry 10 pounds,
stand/walk 6 hours in an 8-hour workday and sit 6 hours in an 8-
hour workday.  Tr. 310.  Dr. Tedesco found that Lambacher had no
limitations with respect to pushing and pulling other than as
shown for lifting/carrying. Id.  Dr. Tedesco found that Lambacher
could frequently stoop and balance; occasionally use ramps, climb
stairs and ladders but never ropes and scaffolds; and occasionally
kneel, crouch and crawl. Tr. 311. Dr. Tedesco found that Lambacher
had no manipulative, visual or communicative limitations and that
the only environmental limitation was that Lambacher had to avoid
concentrated exposure to fumes, odors, dusts, gases and poor
ventilation, etc. Tr. 312.

     Finally, the record contains a report of a visit by
Lambacher to the emergency department at the Wyoming Valley Health
Care System on July 23, 2009, where she complained of chest pain.
Tr. 377-382.  Other than complaining of chest pain, Lambacher made
no other complaints when the attending medical provider reviewed
Lambacher's systems. Tr. 378. The results of a physical
examination were normal including no tenderness in the back upon
palpation, normal inspection of the back, normal inspection of the
upper and lower extremities, normal upper and lower extremity

range of motion, normal gait, normal memory, and no focal motor or sensory deficits. Tr. 379.  Results of laboratory tests were normal.  Id.  A chest x-ray revealed "[n]o acute pulmonary abnormality." Tr. 355.  Lambacher was prescribed pain medications and discharged.  Tr. 379.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Lambacher had not engaged in substantial gainful work activity since April 5, 2007, the alleged disability onset date. Tr. 36.

At step two of the sequential evaluation process, the administrative law judge found that Lambacher had the following severe impairments: "asthma, fibromyalgia, status post cervical fusion and degenerative disc disease[.]" Tr. 37.   The administrative law judge found that Lambacher's high blood pressure, depression and anxiety were non-severe impairments and that a recent claim by her of right hand problems and swelling in both legs was not supported by the medical records. Id.

At step three of the sequential evaluation process the administrative law judge found that Lambacher's impairments did not individually or in combination meet or equal a listed impairment. Tr. 38.

At step four of the sequential evaluation process the administrative law judge found that Lambacher could not perform her past relevant work but that she had the residual functional capacity to perform a limited range of light work except the work could not involve climbing ropes, scaffolds or ladders, exposure to vibration or to pulmonary irritants, and could not involve overhead work or exposure to temperature/humidity extremes. Id.

In arriving at this residual functional capacity the administrative law judge found that Lambacher's statements about her pain and functional limitations were not credible. Tr. 39. The administrative law judge also rejected the one-time evaluation of Dr. Mera and relied on the opinion of Dr. Tedesco that Lambacher could engage in light work. Tr. 42. The ALJ also found that the conclusory opinion of Dr. Gonsky was not supported by Dr. Gonsky's treatment notes and in light of the contrary opinion of Dr. Tedesco rejected Dr. Gonsky's conclusory opinion. Tr. 41-42.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Lambacher could perform work as a ticket taker, inspector and usher, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 43 and 69-70.

The administrative record in this case is 391 pages in length and we have thoroughly reviewed that record. The administrative law judge did an excellent job of reviewing Lambacher's medical history and vocational background in his decision. Tr. 34-44. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant. Lambacher argues that the administrative law judge erred by (1) rejecting the opinion of Dr. Mera, (2) failing to find that Lambacher needed to use a cane to ambulate as well as needed daytime rest periods or naps because of side effects of pain medications, and (3) failing to appropriately assess Lambacher's credibility. We find no merit in Lambacher's arguments.

The Social Security regulations require that an applicant for disability insurance or supplemental security income benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512©. Lambacher failed to provide such evidence. No treating or examining physician or psychiatrist provided a statement indicating that Lambacher prior to December 31, 2007,

had functional limitations for the requisite continuous 12 month period[20] that would prevent her from engaging in the limited range of light work set by the administrative law judge. Furthermore, after the date last insured the ALJ appropriately relied on the opinion of Dr. Tedesco in rejecting the opinion of Dr. Mera and the conclusory opinion of Dr. Gonsky.  Dr. Mera's opinion was not entitled to any special treatment.  She was not a treating physician and only examined Lambacher on one occasion.  The ALJ committed no error by accepting the opinion of Dr. Tedesco and rejecting the opinion of Dr. Mera.  Dr. Tedesco specifically opined that Dr. Mera's opinion was an overestimate of Lambacher's functional limitations and unsupported by the medical records. Tr. 314-315.  As for Dr. Gonsky's conclusory opinion the ALJ appropriately explained his rejection of that opinion as follows:

> The undersigned Administrative Law Judge . . . rejects this opinion as being without support.  These forms do not require the doctor to justify their opinions through objective medical findings, diagnostic test results or other competent evidence.  A review of the evidence of record, including Dr. Gonsky's, indicate no objective findings . . . indicative of a disabling cervical condition.

---

20.  As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Tr. 41.  From our review of the record we cannot conclude that the ALJ abused his discretion.  Furthermore, the opinion of Dr. Tedesco supports the ALJ's decision.

        The administrative law judge relied on the opinion of Dr. Tedesco, a state agency physician who reviewed Lambacher's medical records and the opinion of Dr. Mera.  The administrative law judge's reliance on the opinion of Dr. Tedesco was appropriate. <u>See Chandler v. Commissioner of Soc. Sec.</u>, 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

        With regard to the claim that Lambacher needed to use a cane, no treating physician indicated that Lambacher had to do so or prescribed such.  Furthermore, the medical records repeatedly reported that Lambacher had a normal gait and no loss of strength in the lower extremities.  As for her need for rest period/naps, the ALJ found that Lambacher's asserted limitation were not credible.

        The administrative law judge stated that Lambacher's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work.  The administrative law judge was not required to

accept Lambacher's claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Lambacher testify, the administrative law judge is the one best suited to assess the credibility of Lambacher.

We are satisfied that the administrative law judge appropriately took into account all of Lambacher's credibly established limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the

decision of the Commissioner.

An appropriate order will be entered.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


Dated: March 14, 2013